# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3578NI

_____

|  |  |  |
|---|---|---|
| Ira Jerome Moore, | * | |
| | * | |
| Appellant, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court |
| | * | for the Northern District of |
| | * | Iowa. |
| United States of America, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: March 9, 1999

Filed: May 28, 1999

_____

Before RICHARD S. ARNOLD and HANSEN, Circuit Judges and STROM,[1] District
Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.

Ira Jerome Moore was convicted of attempted bank robbery in violation of 18
U.S.C. § 2113(a), interstate transportation of a stolen vehicle in violation of 18 U.S.C.
§ 2312, and conspiracy to commit an offense against the United States in violation of

_____

[1]The Hon. Lyle E. Strom, United States District Judge for the District of
Nebraska, sitting by designation.

18 U.S.C. § 371. The District Court[2] sentenced him as a career offender to a term of imprisonment of 210 months and was ordered to pay restitution of $528.00. He appeals his conviction and sentence on five grounds. We affirm.

## I.

We first briefly state the facts surrounding the crimes and will provide greater detail below as each issue warrants. Moore and his co-defendant, Terry Fisher, began what the government characterized as a "multi-state crime spree" when they stole a van from a church parking lot in Vidalia, Georgia, with the intention of driving out West. The two got as far as Arkansas when they decided to switch vehicles. They then stole a white compact car from a used-car lot in Bono, Arkansas. According to Fisher's testimony, the two had very little money when they left Georgia, and by the time they reached Arkansas, they had resorted to "panhandling" for gas money. Fisher stated that Moore suggested several times during their trip that they rob a bank along the way in order to raise funds for their journey. Moore told Fisher that he had robbed a bank in Georgia a few years before, that it was easy, and that he had gotten away with it. They continued on in the second stolen vehicle and shortly arrived in Imboden, Arkansas. Fisher testified that upon driving into Imboden they noticed two banks on the highway, and Moore commented that "it would be real easy to do it right [here]." Moore then directed Fisher to write out a demand note. Moore took the note and walked to a nearby bank, but returned to the car a short time later and reported that the bank was closed for President's Day.

After driving around Missouri for a few days, they drove into Iowa, where they stopped to visit Fisher's 87-year-old aunt. The aunt fed them breakfast and lent Fisher a hundred dollars. When they left, Moore took a pellet gun he had found in the aunt's

---

[2]The Hon. Mark W. Bennett, United States District Judge for the Northern District of Iowa.

garage.   They then filled the car with gas and proceeded to Tama, Iowa, where they checked into a motel on February 19, 1998.  They spent the evening losing most of the hundred dollars at a nearby Indian casino and left the next morning with only ten or fifteen dollars.  There were renewed discussions that morning about the possibility of robbing a bank, and somewhere along the way they stopped  at a machine shop, borrowed a hack-saw, and sawed off the barrel of the pellet gun "to make it look more realistic."

Later that same day, February 20, 1998, they arrived in New Providence, Iowa, and decided to pull what would be their final caper.  Moore, who had his face covered by a stocking cap, entered the Hardin County Savings Bank and pointed the sawed-off pellet gun at Alan Staples, the bank's only customer at the time, and Kay Clampitt, the teller and sole employee of the bank.  Staples and Clampitt both testified that at first they thought it was a joke, and that after briefly looking over to Moore, they resumed their discussion about epoxy paint and simply ignored Moore's demand for money.  Moore quickly left, and he and Fisher drove away.  Clampitt then decided to call the police, and Moore and Fisher were stopped a short time later.  Police searched the car, found the demand note from the attempted robbery in Imboden four days earlier, and arrested them both.

Moore was convicted after a jury trial that lasted four days.  Fisher, who had signed a plea agreement, testified against Moore.  Joseph Hartwig, a prisoner housed in the same cellblock with Moore, also testified for the government as to conversations he overheard while in jail, in which Moore admitted his crimes.

II.

Moore's first argument on appeal relates to the validity of a prior conviction in a Georgia state court which was used to qualify him as a career offender under U.S.S.G. § 4B1.1.  This conviction resulted from a guilty plea entered by Moore *pro*

*se* to three counts of burglary in 1987. Moore now claims this conviction was obtained in violation of his Sixth Amendment rights because his waiver of counsel was not knowing and voluntary. He says his lawyer did not advise him of any lesser included offenses, or of any potential defenses to the charges.

Generally, defendants may not collaterally attack prior convictions used for sentencing enhancements. See Custis v. United States, 511 U.S. 485, 487 (1994) (sentence enhanced under the Armed Career Criminal Act of 1984, 18 U.S.C. § 924(e)). There is a limited exception, however, if the prior conviction was obtained in violation of the defendant's right to counsel. Id. at 496 (recognizing "that failure to appoint counsel for an indigent defendant [is] a unique constitutional defect"). See also United States v. Strange, 102 F.3d 356, 362 (8th Cir. 1996). Under this exception, the government has the initial burden of proving the fact of conviction, and then the defendant must show that the conviction was constitutionally infirm. Strange, 102 F.3d at 362-63. The District Court found that Moore had failed to meet this burden. Whether a defendant has validly waived his constitutional right to counsel is a question involving application of constitutional principles to the facts as found, and is reviewed de novo. Wilkins v. Bowersox, 145 F.3d 1006, 1011 (8th Cir. 1998).

To forgo the assistance of an attorney validly, the defendant must make a voluntary, knowing, and intelligent waiver of his right to counsel. Berry v. Lockhart, 873 F.2d 1168, 1170 (8th Cir. 1989). In determining whether the waiver was knowingly and intelligently made, courts must consider the particular facts and circumstances surrounding each case, including the background, experience, and conduct of the accused. "While we prefer that the defendant be given a 'specific on the record warning of the dangers and disadvantages of self-representation'," the lack of such a warning does not necessarily render the waiver invalid. Berry, 873 F.2d at 1170 (quoting Meyer v. Sargent, 854 F.2d 1110, 1115 (8th Cir. 1988)).

The transcript of the entry of the guilty plea and a form called a "Transcript,"

wherein Moore acknowledged being advised of his various rights, were both introduced at Moore's federal sentencing hearing.  The transcript indicates that the trial judge in Georgia engaged in a fairly extensive colloquy with Moore and his co-defendant at the time, Barney Carter, regarding their decisions to waive counsel.  The judge told them that they had the right to be represented and the right to have counsel appointed at no cost.  The judge also explained that "representing yourself is a dangerous act in that you may not know all the law that you might need to know in order to adequately defend yourselves or to properly present all the legal defenses that might be available to you."  (Appellant's App. at 30.)  Both Moore and Carter acknowledged they understood these rights and still wished to represent themselves.  The Georgia judge further inquired into the defendants' mental status.

The Court:  Now are you each able to hear and understand the questions that I'm asking you?

By Defendant Carter:  Yes sir.

By Defendant Moore:  Yes sir.

By the Court:  Are you presently taking any medication or are you otherwise under the influence of any drugs or alcohol?

By Defendant Carter:  No sir.

By Defendant Moore:  No sir but I was.

By the Court:  You were what?

By Defendant Moore:  Under cocaine.

By the Court:  When was this?

By Defendant Moore:  This was during the time that I done this- the burglaries.

By the Court:  But what I'm trying to find out now is whether or now [sic] you're responsible for these decisions that you're making.  In other words do you understand what we're doing here today and are you able to make judgments and decisions here today?

By Defendant Carter:  Yes sir.

By the Court:  Okay.

(Appellant's App. at 31.)

Moore makes much of the fact that he did not respond to the last question asked by the Georgia judge, and this omission received considerable attention at the sentencing hearing.  This is not enough to overcome the presumption of validity that accompanies the prior conviction.  Nor do we find any other indication in the record which suggests that Moore's responses were not knowingly and intelligently given.  Moore had stated already that he was not taking any medication or otherwise under the influence of any drugs or alcohol and was able to hear and understand the questions being asked.  In addition, the Georgia state judge specifically warned Moore about the "dangerous act" of representing himself and explained to Moore that he might "not know all the law that you might need to know in order to adequately defend yourself."  Moore has failed to carry his burden of showing his prior conviction was obtained in violation of his constitutional rights.

III.

Moore next claims that it was error to allow Joseph Hartwig, a fellow prisoner housed on Moore's cellblock, to testify as to incriminating statements Moore made while awaiting trial.  Moore claims that Hartwig was a government informant, and that by leaving Hartwig in Moore's cellblock to elicit incriminating statements, and accepting his assistance, the government violated Moore's Sixth Amendment right to

counsel.

In Massiah v. United States, 377 U.S. 201 (1964), the Supreme Court recognized that a defendant is denied the basic protections of the Sixth Amendment "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel." Id. at 206. Therefore, in order for Moore to prevail on this claim, he would need to show that his right to counsel had attached, that Hartwig was a government agent, and that Hartwig deliberately elicited incriminating statements from him. The government concedes that Moore's Sixth Amendment right to counsel had attached at the time he made incriminating statements to Hartwig, but denies that Hartwig was a government agent, or that Hartwig deliberately did anything to elicit the statements.

After being arrested on February 20, 1998, Moore was taken to the Linn County Jail, where he was housed on the same cellblock with Hartwig. Hartwig was already incarcerated awaiting trial on drug charges. Sometime between February 17 and February 25, 1998, Hartwig received and signed a letter from the United States Attorney's Office agreeing to participate in a meeting with agents in order to provide an informal proffer of information concerning his knowledge of drug-related criminal activity. The stated purpose of the meeting was to assist the government "in determining what, if any, consideration should be afforded [Hartwig] in exchange for [his] agreement to provide information or other cooperation 'on the record' so to speak" (Appellant's App. at 8.) Hartwig testified that at the time he signed the agreement he considered himself a government informant (Tr. 328), but only as to information he had at that time (Tr. 388.) He also stated that he thought that he might benefit from providing information about any criminal activity, not just drug-related activity, but that he did not recall who told him this, and that it might have been his attorney (Tr. 325-26.) Hartwig testified that over the course of the next four or five weeks he overheard Moore conversing with Fisher about some of the details of the car

-7-

theft and bank robbery (Tr. 310-14.) Hartwig further testified that at no time did anyone ask him to listen in on or solicit any comments from Moore (Tr. 384), and that at the time he overheard these conversations, he had no intention of reporting them to the authorities or any notion that this information might be useful to him (Tr. 383.) Hartwig did not reveal this information to law enforcement until around March 17, 1998, when he was providing his statement for the proffer agreement (Tr. 315.)

"[A]n informant becomes a government agent for purposes of [Massiah] only when the informant has been instructed by the police to get information about the particular defendant." United States v. Birbal, 113 F.3d 342, 346 (2d Cir. 1997) (collecting cases). To the extent there was agreement between Hartwig and the government, there is no evidence to suggest it had anything to do with Moore. The proffer agreement simply evidenced Hartwig's willingness to disclose his knowledge of drug activity in hopes of receiving a more favorable plea agreement. Even if we were to accept Hartwig's view that the proffer applied to his knowledge of any illegal activity, there is still no evidence that Hartwig was directed to procure additional information from Moore, or anybody else. As the District Court correctly pointed out, the fact that Hartwig had recently signed a proffer agreement with the government seems to be an unrelated and fortuitous event. We find that the link between Hartwig's relationship with the government and his conduct at issue here is insufficient for his actions to be attributable to the government for purposes of a Massiah violation.

There is also no evidence that Hartwig did anything but act as a passive listening post in gathering this information. In Kuhlmann v. Wilson, 477 U.S. 436 (1986), the Supreme Court made clear that the "primary concern of the Massiah line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation . . . 'the Sixth Amendment is not violated whenever-- by luck or happenstance-- the State obtains incriminating statements.' " Id. at 459 (citing United States v. Henry, 447 U.S. 264, 276 (1980)) ( Powell, J., concurring). "[T]he defendant must demonstrate that the police and their informant took some action, beyond merely

listening, that was designed deliberately to elicit incriminating remarks." Id. at 459. In this case, Moore has not alleged anything to suggest he was subject to any improper or surreptitious interrogation.

IV.

Moore also claims the District Court erred by allowing Fisher to testify that Moore had told him that he had previously robbed a bank, that it was easy, and that he had gotten away with it. Moore argues that this testimony was intended only to show that he acted in conformity with his previous conduct, and that it was unfairly prejudicial. The District Court admitted the testimony with the admonition that the jury should consider this evidence only to decide "motive, intent, knowledge, plan, or preparation" (Tr. 254.) In denying Moore's motion for a new trial on this issue, the Court further explained that the evidence was proper because it tended to show how Moore used his earlier success to persuade Fisher to assist him with the charged offense. Thus, evidence of the prior robbery was admissible "to show . . . Moore's state of mind and motive" (Appellant's App. at 52.) We review the District Court's evidentiary rulings for an abuse of discretion.

Under Fed. R. Evid. 404(b), "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, as noted above, Moore was charged and convicted of both conspiracy to commit an offense against the United States and attempted bank robbery. In our view, this evidence is probative of the former offense and admissible as evidence of the crime charged. Fisher testified that he and Moore were extremely short of funds, that Moore suggested robbing a bank to raise money, and that Moore bragged that he had successfully robbed a bank before, and that it was easy. This testimony establishes that Moore saw bank robbery as a viable means of raising money and supports the inference that he used his prior success to persuade Fisher to enter into the conspiracy. The agreement between Fisher and Moore is an essential element of the conspiracy

charge, and evidence that explains the genesis of this agreement is relevant. Evidence that "tends logically to prove any element of the crime charged, . . . is admissible as an integral part of the immediate context of the crime" and is not governed by 404(b). United States v. Bass, 794 F.2d 1305, 1312 (8th Cir. 1986) (citations omitted). Such evidence is still subject to the requirement of Fed. R. Evid. 403 that its probative value is not substantially outweighed by the danger of unfair prejudice. Here, the District Court determined that the evidence was not unfairly prejudicial, and we do not find this decision to be an abuse of discretion.

V.

Moore also claims it was error to allow Fisher to testify about their failed attempt to rob a bank in Imboden, Arkansas, four days before the attempted robbery of the Hardin County Savings Bank. Moore's brief argues only that "the probative value of the Arkansas bank evidence is greatly outweighed by it prejudicial effect" (Appellant's Br. at 20.) In the order denying the motion for a new trial, the District Court ruled that this evidence was "an integral part of the immediate context of the crime charged" (citations omitted) because it tended to prove the men's overall plan to rob a bank to raise money for their escape after the second car theft. In addition, the Court found that the probative value of the evidence was not substantially outweighed by its prejudicial effect. We agree with the District Court's reasoning and conclusions and again find no abuse of discretion.

VI.

Moore's final argument concerns the District Court's judgment ordering him to pay $528.00 in restitution to Alan Staples, the customer present during the attempted bank robbery, for lost wages incurred as the result of time spent giving statements,

-10-

identifying the suspects, and preparing for and testifying at trial.[3]

The District Court's award of restitution in this case is governed by the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A. The Act directs the sentencing court to order restitution for the "victim of the offense," and § 3663A (a)(2) defines the term "victim" as "a person directly and proximately harmed as a result of the commission of an offense." Moore claims that Staples was not a "victim"of the attempted bank robbery since he was attempting to rob the bank, not Staples. Moore contends that Staples was merely a witness to the attempted bank robbery, and that any loss Staples suffered was not "directly" or "proximately" caused by the robbery attempt but instead by his being subpoenaed to testify in court. This second argument confuses the question of Staples's status as a "victim" under the Act with the fact that the losses which flowed from that status also relate to his duties as a witness. The Act plainly allows victims to recover such losses. Section 3663A(b)(4) states:

> in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

Thus, once it is established that Staples qualifies as a victim under the Act, the fact that he claims losses associated with his responsibilities as a government witness in no way undermines this status. Moore's first argument, that a bank customer is not a victim of an attempted bank robbery, is also unpersuasive. As noted, Moore pointed what appeared to be a sawed-off shotgun at the only two people in the bank and demanded money. According to Clampitt's testimony, Moore was about six feet away

---

[3]The victim impact statement taken from Staples by the U.S. Attorney's Office indicates that he lost four days of work, for a total of $608.00 in earnings. This amount was reduced by the $80.00 he received as a witness fee, leaving a balance of $528.00 (Presentence Investigation Report ¶ 24.)

from her and Staples at the time, and she and Staples were within two feet of each other. Under these circumstances, Staples easily qualifies as a victim for purposes of the Act. As the District Court aptly stated: "Not every bystander would be a victim, but everybody who was looking down the barrel of a gun seems to me to be a victim" (Sentencing Tr. 69.)

Affirmed.

A true copy.

     Attest:

         CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.