# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3920

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Mark Adams, | * | Eastern District of Missouri. |
| | * | |
| Appellant. | * | |

_____

Submitted: December 16, 2009
Filed: May 11, 2010

_____

Before RILEY, Chief Judge,[1] WOLLMAN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

A jury found Mark Adams guilty of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The district court[2] sentenced Adams to 115 months' imprisonment. Adams appeals his conviction, arguing the district court abused its discretion in admitting certain evidence and clearly erred in rejecting his challenge under Batson v. Kentucky, 476 U.S. 79 (1986), to the government's

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

[2]The Honorable E. Richard Webber, United States District Judge for the Eastern District of Missouri.

peremptory strikes of African American venire persons.  For the following reasons, we affirm.

## I. Background

A grand jury returned a one-count indictment charging Adams with being a felon in possession of a firearm "on or about March 14, 2008."  At trial, Adams stipulated to his felon status.  The government's main witnesses were St. Louis police officer Daniel Fox and one of Adams's roommates, Lamario Thomas.

Fox testified that he began investigating Adams in March 2008 based on information that Adams was distributing drugs out of the house he shared with Thomas and several other individuals.  Fox also had information that Adams possessed firearms on the premises and determined Adams had a prior felony conviction.  On three occasions between March 7 and March 10, 2008, Fox conducted surveillance of the residence and witnessed Adams engage in what he believed, based on his experience, to be a total of seven "hand-to-hand" drug transactions with different individuals.  On March 12, Fox obtained a warrant for the house to search for drugs and firearms.  The following day, Fox was patrolling in the vicinity of the house and observed Adams walking nearby.  Fox approached Adams, explained he had a search warrant, detained Adams on an outstanding traffic warrant, searched him, and transported him back to the house.

Fox and other officers then executed the search warrant.  In a second-floor bedroom, Fox discovered a loaded semiautomatic rifle lying on the floor next to the bed.  On top of a speaker next to the bed,  Fox found state identification paperwork, bearing Adam's name and photograph, but a different address.  From a shoebox on top of a dresser, Fox recovered an AutoZone receipt with "M. Adams" on it and two bags of ammunition, one of which contained rounds consistent with the rifle.  Officers did not recover drugs during the search.  Adams was arrested on the additional charge of being a felon in possession of a firearm.

Thomas confirmed Adams lived with him and testified that he observed Adams possess the firearm at the house on four occasions prior to Adams's arrest. According to Thomas, Adams primarily used two rooms in the house: he slept and kept his belongings in the second-floor bedroom where the gun, papers, and ammunition were found and used another second-floor room, painted blue, for entertainment. In fall 2007, Thomas walked into the kitchen and observed the rifle on the kitchen table within arm's reach of Adams. Adams yelled at Thomas to leave, and Thomas ran out of the room. Later in 2007, Thomas entered the "blue room" without knocking and saw Adams with the rifle close to him. Adams again yelled at Thomas to leave and Thomas complied. In early 2008, Thomas heard rapid gunfire close to the back of the house. Thomas went to the kitchen and saw Adams emerge from the basement with the rifle. Adams apologized for scaring Thomas and promised to tell Thomas next time he decided to fire the gun. Finally, around February 2008, Thomas again heard a gun discharge in the backyard. Thomas met Adams when Adams returned to the house. Concerned that the shots had attracted the attention of police patrolling the area, Thomas exited the house and informed the police about what had occurred, though he did not indicate whether the police investigated the incident that night. Thomas testified that Adams was the only person he had seen possess or discharge the rifle at the residence.

## II. Discussion

### A. Prior possession testimony

Adams challenges the district court's rulings concerning his prior possession and discharge of the rifle. Before trial, the district court ruled the government could introduce the testimony pursuant to Rule 404(b) as evidence of knowledge or intent to possess the firearm. Citing our decision in United States v. Rock, 282 F.3d 548 (8th Cir. 2002), the district court determined at trial that the evidence of prior possession was intrinsic to the charged offense. Although Adams does not concede

-3-

the evidence could be properly admitted under Rule 404(b), he primarily argues on appeal that the district court erred in relying on Rock to treat the evidence as intrinsic to the crime charged and to admit it without a limiting instruction. Reviewing for abuse of discretion, United States v. Nadeau, 598 F.3d 966, 968 (8th Cir. 2010), we find no error in the admission of this evidence.

In Rock, we held evidence that the defendant burgled a storage unit, carried firearms to the residence he shared with his girlfriend, and displayed them to various people on a date prior to his arrest "was not merely evidence of other wrongs" but "directly supported" the government's charge that the defendant possessed the firearms. Id. at 550–51. The defendant in Rock argued that while the display of the weapons at other times was evidence of possession, the government did not need the burglary evidence to prove its case. Id. at 551. We concluded that 404(b) did not bar presentation of the entire episode because it "completes the story of the crime or explains the relationship of the parties or the circumstances surrounding a particular event." Id. Adams's argument that the prior possession testimony neither completes the story nor gives a "total picture" of his possession of the rifle on March 14, 2008 misses the mark. This testimony is evidence of possession that "directly supports" the charge.

Even if we were to find Rock inapplicable, we affirm nonetheless. See United States v. Gettel, 474 F.3d 1081, 1087 (8th Cir. 2007) (court of appeals may affirm the admission of evidence on any basis supported by the record). The government could prove that Adams knowingly possessed the gun by showing he actually or constructively possessed it. United States v. Byas, 581 F.3d 723, 726 (8th Cir. 2009). Constructive possession may be established by evidence demonstrating ownership, dominion, or control over a gun. Id. (quotation omitted). Here, the testimony indicates that the same individual was in sole, knowing possession of the same rifle in the same house on four successive occasions leading up to the charged date. Such testimony therefore helps to establish his ownership or control of the gun. As the evidence

-4-

"tends logically to prove [an] element of the crime charged," it is not subject to Rule 404(b). Moore v. United States, 178 F.3d 994, 1000 (8th Cir. 1999). Such evidence is still subject to Rule 403. Id. We have little trouble in concluding that Rule 403 would not bar the testimony here. How the defendant used and controlled the weapon under similar circumstances is directly relevant to the charged offense. See Rock, 282 F.3d 548.

Adams next asserts that the prior possession testimony constructively amended the indictment because it altered the date of the offense. The government counters Adams is really arguing a variance arose instead. The difference between the two is well established, though at times difficult to apply: "a constructive amendment changes the charge, while the evidence remains the same; a variance changes the evidence, while the charge remains the same." United States v. Stuckey, 220 F.3d 976, 981 (8th Cir. 2000). A constructive amendment primarily affects the defendant's Fifth Amendment right to indictment by a grand jury and constitutes reversible error per se, while a variance implicates the defendant's Sixth Amendment right to notice of the nature of the charge and is subject to harmless error analysis. Id. Upon de novo review, see id. at 979, we conclude neither constructive amendment nor a variance occurred.

Because Adams argues the testimony changed the date of the offense, not the offense charged, no constructive amendment occurred. See United States v. Howe, 538 F.3d 842, 850 (8th Cir. 2008), abrogated on other grounds by United States v. Villareal-Amarillas, 562 F.3d 892 (8th Cir. 2009). We conclude no variance occurred either, particularly because the government never wavered in its theory of the case at trial: the location where the gun was found established Adams possessed the firearm "on or about" the charged date and Thomas's testimony simply provided confirmation of possession. See Howe, 538 F.3d at 851 (no variance where government's theory did not change and allegedly problematic closing argument merely summarized that theory); cf. United States v. Johnson, 934 F.2d 936, 941–42 (8th Cir. 1991) (no

constructive amendment for same reason). In sum, we reject Adams's arguments that there was either a constructive amendment to or a variance in the indictment.

B. Surveillance and drug transaction testimony

Adams also argues that the district court should have limited Officer Fox's testimony to the execution of the search warrant. According to Adams, the testimony concerning the surveillance was irrelevant and unfairly prejudicial, and the testimony of hand-to-hand transactions amounted to propensity evidence in violation of Rule 404(b). The district court had excluded baggies and a digital scale found in the same room as the firearm out of a concern that the trial would become a narcotics case. Adams reasons the same should have applied to other evidence of drug dealing as well.

Assuming, without deciding, that the district court abused its discretion in admitting this evidence, any error was harmless. United State v. LaDue, 561 F.3d 855, 859 (8th Cir. 2009) (improper evidentiary rulings are subject to harmless error analysis and will be disregarded if there is no substantial influence on the verdict). The properly admitted evidence established both Adams's dominion and control over the location where the firearm was found out in the open as well as his dominion and control over the weapon itself. We therefore reject Adams's arguments based on the admission of this evidence.

C. Batson challenge

Adams also challenges the government's use of peremptory strikes against three African American venire persons, jurors 1, 23, and 27. Batson applies to the federal government through the Due Process Clause of the Fifth Amendment. United States v. Wilcox, 487 F.3d 1163, 1170 (8th Cir. 2007). The Batson inquiry involves the following three-step analysis:

First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

United States v. Morrison, 594 F.3d 626, 632 (8th Cir. 2010) (quoting Miller-El v. Cockrell, 537 U.S. 322, 328–29 (2003)). We review the district court's resolution of a Batson challenge for clear error. United States v. Granados, 596 F.3d 970, 975 (8th Cir. 2010).

The district court determined that Adams established a prima facie case because three of the six venire persons the government struck were African American and one of those struck, juror 1, had not spoken during voir dire except to state where he lived in response to the court's question. In response, the government, relying on the jurors' answers to a questionnaire, explained that it exercised peremptory strikes against all jurors who rented their homes out of a concern that they would have an insufficient stake in the community. These challenges included jurors 1 and 27 as well as two white jurors. The district court had randomly excused the remaining renter on the venire panel. Additionally, the government stated that it struck juror 23 along with another juror because they expressed dissatisfaction with law enforcement's response to crimes committed against them.

The district court determined these explanations were race neutral, a finding that we conclude was not clearly erroneous. An individual's status as a renter may indicate he or she does not have substantial ties to the community. See United States v. Carr, 67 F.3d 171, 175–76 (8th Cir. 1995). We have found a lack of attachment to the community to be a valid reason to exercise a peremptory strike. United States v. Gibson, 105 F.3d 1229, 1232 (8th Cir. 1997) (collecting cases). Furthermore, we have stated that "[a] juror's expression of past dissatisfaction with law enforcement officers, which could indicate potential bias against the prosecution, is a legitimate race neutral

reason for striking potential jurors." United States v. Booker, 576 F.3d 506, 511 (8th Cir. 2009); see also United States v. Brown, 560 F.3d 754, 763 (8th Cir. 2009); Gibson, 105 F.3d at 1232.

After the government articulated race-neutral reasons for striking African-Americans, the burden returned to Adams to show pretext. Gibson, 105 F.3d at 1232. Adams argued that the proffered reasons were pretextual because the government had failed to ask follow-up questions that would probe the jurors' responses, particularly regarding the renters' ties to the community. The district court acknowledged for the record that, in St. Louis, African Americans were among those individuals more likely to rent than to own their homes. Notwithstanding Adams's argument and despite acknowledging a correlation between race and a lack of property ownership, the district court held Adams had failed to show purposeful discrimination in the government's exercise of peremptory strikes. Its rejection of the Batson challenge was not clearly erroneous. See United States v. Davis, 154 F.3d 772, 782 (8th Cir. 1998) (no Batson violation when the government failed to solicit certain information through voir dire that nonetheless became known); United States v. Hart, 544 F.3d 911, 915 (8th Cir. 2008) (no Batson violation where all venire panel members similarly situated to African Americans were struck).[3]

---

[3]The district court was troubled by the fact that the government used a facially race-neutral rationale, renter status, to strike African American jurors, when, as the district court noted, African Americans in St. Louis were more likely to rent than to own their homes. This opinion should not be read to mean that a defendant can never sustain a Batson challenge when the government advances a potential juror's renter status and/or insufficient stake in the community as a race-neutral reason for a peremptory strike. Instead, this case is an example of our limited scope of review. In rejecting the challenge, the district court noted its belief that the prosecutors were credible. Because a trial court's findings on a Batson challenge largely turn on an evaluation of the prosecutor's credibility, the court of appeals gives great deference to its conclusions. United States v. Roebke, 333 F.3d 911, 913 (8th Cir. 2003).

## III. Conclusion

For the foregoing reasons, we affirm.

_____