# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2394

_____

Zackary Lee Stewart

*Plaintiff - Appellee*

v.

Karl Wagner, Matt Selby

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Western District of Missouri - Springfield

_____

Submitted: February 9, 2016
Filed: September 12, 2016

_____

Before RILEY, Chief Judge, LOKEN and BENTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

In 2008, a Missouri jury convicted Zackary Stewart of murdering David Dulin. On appeal, Stewart argued the trial court erred in denying his motion for new trial based on newly-discovered evidence. The Supreme Court of Missouri agreed, reversed the conviction, and remanded for a new trial. State v. Stewart, 313 S.W.3d 661 (Mo. banc 2010). The charges were dropped when another person confessed to

the murder. Stewart then filed this civil damage action against five individuals and Stone County, Missouri, asserting various claims under 42 U.S.C. § 1983 and Missouri state law. Defendants moved for summary judgment. The district court granted summary judgment and dismissed Stone County, the County Sheriff, and the Sheriff's criminal investigation supervisor. The court denied the motions of Stone County Prosecutor Matt Selby, lead investigator Karl Wagner, and investigator Orville Choate, who has not appealed, rejecting their claims of absolute, qualified, and official immunity. Selby and Wagner appeal. We reverse in part and remand.

## I. Jurisdiction and the Issues on Appeal.

"An interlocutory order denying qualified immunity is immediately appealable to the extent that it turns on an issue of law. If the order turns on issues of fact, rather than an abstract issue of law, we lack jurisdiction over the appeal because the decision is not a final order immediately appealable under the collateral order doctrine." Aaron v. Shelley, 624 F.3d 882, 883-84 (8th Cir. 2010) (citation and quotations omitted). We also lack jurisdiction over pendent interlocutory claims under state and federal law unless those claims are "inextricably intertwined with the collateral order that is properly appealed, or where review [is] necessary to ensure meaningful review of the properly appealed issue." Kincade v. City of Blue Springs, 64 F.3d 389, 394 (8th Cir. 1995), cert. denied, 517 U.S. 1166 (1996).

Here, Selby properly appeals the denial of qualified immunity and absolute prosecutorial immunity from Stewart's § 1983 due process claim based on the alleged fabrication of false testimony by a witness at Stewart's preliminary hearing. Selby and Wagner properly appeal the denial of qualified immunity from Stewart's § 1983 Sixth Amendment claims for actions that resulted in testimony by jailhouse informants at his criminal trial. However, we decline Selby's further invitation to review the district court's denial of (i) § 1983 claims that Selby has not briefed, such

as Stewart's § 1983 conspiracy claim; and (ii) Stewart's state law claims.[1] This opinion should not be construed as expressing our view on any of these other claims, with the following exception:

Stewart claims that investigators Wagner and Choate violated his right to due process as defined in Brady v. Maryland, 373 U.S. 83, 87 (1963), when they caused the prosecution not to disclose evidence that would have been favorable to the defense at Stewart's trial. The summary judgment record is replete with material fact disputes regarding these claims, and Wagner has not appealed the denial of qualified immunity. However, we note that, while a prosecutor's duty to disclose is absolute, to recover damages from other law enforcement officials for a Brady violation, a § 1983 plaintiff must prove the requisite *mens rea*. In denying investigators Wagner and Choate summary judgment on this claim, the district court adopted the amorphous "bad faith" *mens rea* standard set forth in White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008), rather than the more precise standard adopted in our earlier, and therefore controlling, opinion in Villasana v. Wilhoit, 368 F.3d 976, 980 (8th Cir. 2004) -- "Brady ensures that the defendant will obtain relief from a conviction tainted by the State's nondisclosure of materially favorable evidence, regardless of fault, but the recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor *intended to deprive the defendant of a fair trial*." (Emphasis added.) The district court must apply this controlling standard when the issue again arises on remand, whether before, during, or after trial.

---

[1]Selby argues that he is entitled to official immunity under Missouri law for his performance of discretionary acts as a prosecutor. But he cites no authority, as he must, establishing that interlocutory denials of official immunity under state law are collateral orders within our limited appellate jurisdiction. In addition, Missouri's official immunity doctrine shields only negligent acts. Davis v. Lambert-St. Louis Int'l Airport, 193 S.W.3d 760, 763 (Mo. banc 2006). The district court found genuine issues of material fact as to whether Stewart could prove intentional misconduct, not merely negligent acts.

## II. The "Fabricated Evidence" Claim.

On November 29, 2006, Dulin called 911 from his home in Stone County and reported that he had been shot with his own .22 caliber handgun by two men in their twenties or thirties, and that one identified himself as the boyfriend of an "Eby girl from Hurley." Dulin died at the scene. The Stone County Sheriff's Office assigned Wagner as lead detective in the homicide investigation.

The investigation focused on Dulin's statement that the boyfriend of an "Eby girl from Hurley" was involved. Stewart, then eighteen years old, was the son of Paula Eby of Hurley. His sisters were Candy Seaman, married to but separated from Tim Seaman, and Christy Pethoud, then living with her boyfriend, Leo Connelly. Though Pethoud's last name was not "Eby," the investigation treated her as an "Eby girl." Interviewed on December 1, Stewart told investigators that he spent the night in question at the home of Pethoud and Connelly, and that Tim Seaman was married to his sister, Candy Seaman.

On March 15, 2007, Alicia Kimberling arrived at the Stone County Judicial Center for a probation appointment. Wagner learned that Kimberling had said Leo Connelly was involved in the homicide. He arrested her for an unresolved probation violation and interviewed her. Kimberling identified Connelly and Pethoud as Dulin's killers but did not claim Stewart was involved. Wagner told her Stewart was a suspect and Stewart and Connelly were together that night. She agreed to assist the investigation after learning about potential rewards for cooperating. Wagner provided Kimberling with devices to record conversations with Connelly, Candy Seaman, and Stewart on March 16, 17, and 20. The recordings provided no incriminating evidence.

On March 27, after Selby had discussed a plea agreement with Kimberling's attorney, Selby and Wagner interviewed Kimberling. She incriminated Stewart for

the first time, claiming that she saw Stewart, Connelly, and Pethoud in a car shortly after the homicide; that Connelly was covered in blood; that Stewart was in the back of the car; and that she saw a gun. At this point in the recorded interview, Kimberling stopped answering questions and said: "I'm scared. . . . I'm so scared to talk to you guys." Selby responded:

> You know, Alicia, you're not -- I don't think by talking you're increasing anything that you have to be scared of, you know what I'm saying? I mean, the things that you've already talked about would put you in the position of being a witness. Okay? So to tell everything you know is not going to make things any worse, but if it's more helpful to us, it's going to be more helpful to you.

Also on March 27, Wagner questioned Stewart about the Dulin homicide; Stewart denied involvement or knowledge. On March 29, Wagner completed an affidavit or statement of probable cause, reciting what Kimberling said to implicate Stewart at the March 27 interview. The statement did not report that she had implicated Pethoud and Connelly, but not Stewart, at the initial interview. That day, Selby filed murder charges against Stewart and Connelly based on the probable cause statement; Stewart, in the middle of serving a two-week jail sentence for DWI, was detained on the murder charge. Some weeks later, Kimberling testified at the preliminary hearing. She did not testify at Stewart's trial.

Count I of Stewart's Second Amended Complaint included the § 1983 claim that Prosecutor Selby and Detective Wagner procured Kimberling's fabricated statements to create probable cause when none existed. Stewart's Suggestions in Opposition to defendants' summary judgment motions argued this part of his claims in Count I as a violation of his right to substantive due process. In denying defendants' motions for summary judgment, the district court concluded that "Wagner's reliance on the portions of Alicia Kimberling's statements that corroborated the theory of the case that Zack Stewart committed the murder, but

ignored her contradictory statements without further investigation violated [Stewart's] due process rights." On appeal, Selby argues the court erred in denying his motion for summary judgment on this claim. "Whether a substantive due process right exists is a question of law." Moran v. Clarke, 296 F.3d 638, 643 (8th Cir. 2002) (en banc).

Because the Supreme Court is "reluctant to expand the concept of substantive due process," it has held "that where a particular Amendment provides an explicit textual source of constitutional protections against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing those claims." County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (citations and quotation omitted). Therefore, a § 1983 plaintiff's claim that he was arrested or prosecuted without probable cause, even if labeled a claim of malicious prosecution, "must be judged" under the Fourth Amendment, not substantive due process. Albright v. Oliver, 510 U.S. 266, 270-71 & n.4 (1994) (plurality opinion joined by seven Justices on this issue). We recognized in Moran that additional considerations in a particular case may trigger substantive due process protection, like the impact of "falsely-created evidence and other defamatory actions" on a public employee plaintiff's career, and the equal protection interest in not being investigated or punished on account of race, that were present in that case. 296 F.3d at 645. But here, Stewart was not a public employee, race was not an issue, and the alleged fabricated evidence was only used in a probable cause statement. Thus, the general rule in Oliver applies, and the district court committed an error of law in not judging the actions of Selby and Wagner under the Fourth Amendment.

Stewart's Suggestions in Opposition to summary judgment made only a cursory reference to one Fourth Amendment precedent, Malley v. Briggs, 475 U.S. 334 (1986). He made no showing that the Fourth Amendment required Wagner to disclose all of Kimberling's statements in a probable cause statement, and no showing that Wagner and Selby did not have *arguable* probable cause to arrest, the governing

Fourth amendment standard.  See New v. Denver, 787 F.3d 895, 899 (8th Cir. 2015). "The evaluation of evidence to determine if probable cause exists is not an exact science."  Brodnicki v. City of Omaha, 75 F.3d 1261, 1265 (8th Cir.). cert. denied, 519 U.S. 867 (1996).  Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  Hunter v. Bryant, 502 U.S. 224, 229 (1991) (quotations omitted).  We note that the preliminary hearing at which Kimberling testified was nearly two months after charges were filed based on Wagner's probable cause statement.  Stewart did not gain pretrial release or dismissal of the charges at that hearing, which strongly suggests that the presence of arguable probable cause was overwhelming.

On this record, we conclude it was error to deny Prosecutor Selby qualified immunity on this claim because Stewart failed to present sufficient evidence that Wagner and Selby violated "clearly established [Fourth Amendment] rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982); cf. Morris v. Lanpher, 563 F.3d 399, 403 (8th Cir.), cert. denied, 558 U.S. 970 (2009).  Given this conclusion, we need not consider Selby's alternative argument that he is entitled to absolute immunity from this claim.

### III.  The Sixth Amendment Claims.

On the afternoon of March 30, Victor Parker and Coty Pollard, Stewart's cell mates, told Wagner they had information on the Dulin homicide but said they wanted their lawyer present when they disclosed the information and a benefit in exchange for providing it.  Parker told Selby at a second interview on April 3 that Wagner told him to "find out anything you can."  After being approached by Parker and Pollard, Wagner questioned Stewart about his statements to his cellmates.  Stewart said, "I didn't tell em nothin, I don't know nothin.  I need to speak with an attorney."  Wagner then asked Selby if he could arrange for Parker and Pollard's lawyer to be present while they were questioned; Parker and Pollard were returned to their cell with

Stewart. Between March 30 and April 3, Parker repeatedly questioned Stewart about the Dulin homicide and encouraged Stewart to implicate himself in the murder, despite Stewart's insistence he was not involved.

On April 3, Wagner and Selby interviewed Parker. During this interview, Parker offered to question Stewart about the murder. Wagner said, "we can't really ask you to go back there and dig for anything, I would say if you do happen to hear anything, I would really like to hear about it but I can't ask you to go back there and ask questions specifically." Selby added, "if you do anything on law enforcement's behalf, [it's] just as if the law enforcement was doing it themselves . . . . [O]n the other hand, I don't think there's any obligation that just because he's talking to you that we have to move you out of there." Selby told Parker he did not need to "put [his] pillow over [his] ears if [Stewart] starts talking or anything." Parker and Pollard testified at Stewart's trial and were, in Selby's words, the "key witnesses." See Stewart, 313 S.W.3d at 665-66. Stewart's only trial witness was his sister, Pethoud, who testified that Stewart stayed overnight at her house on the night of the murder. Id. at 664.

Once the adversary judicial process has been initiated, the Sixth amendment guarantees a defendant the right to have counsel present at all critical stages of the criminal proceedings, including interrogation by the State. See United States v. Gouveia, 467 U.S. 180, 187 (1984); Massiah v. United States, 377 U.S. 201, 204-05 (1964). In Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986), the Supreme Court stated the applicable standard when the issue is whether trial testimony of a jailhouse informant should be suppressed for violation of this principle:

> Since the Sixth Amendment is not violated whenever -- by luck or happenstance -- the State obtains incriminating statements from the accused after the right to counsel has attached, a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his

incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

(Quotations and citation omitted.) Applying this principle, we have held that, to establish a Sixth Amendment violation warranting suppression of statements made to a jailhouse informant, defendant must show (1) "his right to counsel had attached," (2) the informant "was a government agent," and (3) the informant "deliberately elicited incriminating statements from him." Moore v. United States, 178 F.3d 994, 999 (8th Cir.), cert. denied, 528 U.S. 943 (1999).

Stewart claims Wagner and Selby violated his Sixth and Fourteenth Amendment right to counsel when they obtained a false confession "through the use of jailhouse snitches Pollard and Parker as [their] agents." The district court denied Wagner and Selby qualified immunity from this claim because there exists "genuine issues of material fact as to whether [they] violated Stewart's Sixth Amendment right to counsel by directing Parker to glean additional information from Stewart after he had invoked his right to counsel, and by sending Parker and Pollard back into the same cell with Stewart after he had invoked his right to counsel, thereby creating a 'situation likely to induce' [Stewart] to make incriminating statements."

If this were an appeal from the denial of a motion to suppress or exclude the testimony of Parker and Pollard, or from the denial of a properly preserved federal habeas claim, we might well agree there is sufficient evidence of a Sixth Amendment violation under Kuhlmann to warrant a full trial of this claim. But this is the appeal from the denial of qualified immunity from a § 1983 claim. Neither the district court nor Stewart cited, and we have not found, a reported federal decision discussing the elements of a § 1983 Sixth Amendment claim based on use of a jailhouse informant's testimony at trial, and the proper application of qualified immunity principles to such a claim. The absence of such precedent is not dispositive but is clearly relevant.

-9-

Because qualified immunity protects all but the incompetent, and knowing violators, "[w]e do not require a case directly on point before concluding [the § 1983 defendant violated] clearly established [law], but existing precedent must have placed the statutory or constitutional question beyond debate." Stanton v. Sims, 134 S. Ct. 3, 5 (2013), quoting Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2083 (2011). Here, the Supreme Court and Eighth Circuit cases most directly on point, Kuhlmann and Moore, require Stewart to prove that Wagner and Selby took action "that was designed deliberately to elicit incriminating remarks," not merely listening, thereby making Pollard and Parker government agents. "An informant becomes a government agent for purposes of [the Sixth Amendment's protection against deliberate government elicitation] only when the informant has been instructed by the [government] to get information about the particular defendant." Moore, 178 F.3d at 999 (quotation omitted). Here, according to Parker, Wagner told him to "find out anything you can" a few hours after Selby filed charges against Stewart -- which started the "adversary judicial process" for purposes of Massiah – but before Stewart *invoked* his right to counsel for the first time after cooperating with investigators for some four months.

The following facts are undisputed: (i) Parker and Pollard came to Wagner the afternoon of the day Stewart was first charged, offering to provide information that Stewart had volunteered the night before, which turned out to be a confession that he participated in the murder but lacking details; (ii) before that, Stewart had repeatedly talked to Wagner about the murder without invoking his right to counsel; (iii) according to Parker, Wagner told him to "find out anything you can" from Stewart; (iv) Wagner immediately told Stewart that his cell mates said he had confessed, and Stewart invoked his right to counsel; (v) when Wagner and Selby met with Parker and Pollard a few days later, they instructed the informants to continue listening but not to elicit statements from Stewart, because that would be "just as if the law enforcement was doing it themselves;" (vi) they then put Pollard and Parker back in Stewart's cell.

-10-

Wagner and Selby testified they were aware of and believed their actions at the April 3 interview did not violate Stewart's Sixth Amendment rights. Even if Wagner had encouraged Parker to be more than a "listening post" at the March 30 meeting (a disputed issue of fact), Wagner immediately told Stewart that his cell mates were reporting what he said, fair warning not to talk to them if he was invoking his right to counsel. The judgment of Wagner and Selby on this issue may have been wrong, but Kuhlmann and the earlier cases it applied create a very indistinct line between aggressive use of jailhouse informants that does and does not violate the Sixth Amendment rights of a defendant who has just been charged and invokes his right to counsel. And there were no § 1983 precedents giving these defendants "fair and clear warning of what the Constitution requires," Al-Kidd, 131 S. Ct. at 2086-87 (quotations omitted), and therefore no "existing precedent [that] placed the statutory or constitutional question beyond debate," Stanton, 134 S. Ct. at 5. In such circumstances, suppression, not § 1983 damage liability, is the appropriate remedy. Cf. Hannon v. Sanner, 441 F.3d 635, 638 (8th Cir. 2006).

There is another fundamental reason why Wagner and Selby deserve qualified immunity from this § 1983 damage claim. Stewart failed to put in the summary judgment record evidence of whether defense counsel at trial moved to suppress or exclude testimony by Parker and Pollard because it was obtained in violation of the Sixth Amendment; if so, how the trial court ruled; and whether the issue was then pursued on direct appeal. If the motion was made and denied, that would at least establish there was no clearly established violation of the Sixth Amendment. If the motion was made and granted, the ruling would only have excluded testimony by Parker and Pollard after they were effectively functioning as government agents; any "confession" they heard before then would not be excluded, leaving Stewart unable to prove § 1983 injury causation. If the motion was not made at all, then any injury to Stewart from the trial testimony of Parker and Pollard was caused by the supervening ineffective assistance of trial and/or appellate counsel. There is no

-11-

constitutional tort without injury. Buckley v. Fitzsimmons, 20 F.3d 789, 796 (7th Cir. 1994).

For these reasons, we conclude the district court erred in denying Wagner and Selby qualified immunity from this Sixth Amendment damage claim, and we need not consider Selby's alternative absolute immunity contention.

The order of the district court dated June 12, 2015, is reversed in part, and the case is remanded for further proceedings not inconsistent with this opinion.

_____