# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3085
_____

United States of America

*Plaintiff - Appellee*

v.

Oren Paris, III

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: September 27, 2019
Filed: March 31, 2020

_____

Before KELLY, MELLOY, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

This case involves a bribery-and-kickback scheme with three main participants: a college president, a state senator, and a business consultant. The college president was Oren Paris, III, who pleaded guilty to honest-services wire

fraud.  *See* 18 U.S.C. §§ 1343, 1346.  He claims that the district court[1] should have dismissed the indictment against him after alleged government misconduct came to light.  We affirm.

I.

While serving as president of a private college in Arkansas, Paris entered into a kickback scheme with then-senator Jonathan Woods, who directed state funds to the college.  The college then sent a portion of the funds to a consulting business owned by Randell Shelton, who gave money to Woods.  All three men were charged as co-conspirators in the scheme.

The case against them stalled due to allegations of government misconduct.  First, the lawyer who initially represented Woods had also represented Robert Cessario, the lead FBI agent on the case, in an unrelated divorce proceeding.  Second, Micah Neal, a former state representative who separately pleaded guilty to receiving kickbacks, secretly recorded conversations with Woods and then allowed the government to access the recordings.  Third, after the parties discovered previously undisclosed recordings on the eve of trial, Agent Cessario hired a local computer shop to erase the hard drive of his laptop.

These events led Paris to seek, as relevant here, dismissal of the indictment on Fifth Amendment due-process and Sixth Amendment right-to-counsel grounds.  After holding multiple evidentiary hearings, the district court rejected challenges based on the first two allegations of misconduct but concluded that the bad-faith destruction of evidence on the laptop violated due process.  Rather than dismissing the indictment, however, it ordered a narrower, more "proportional" remedy: prohibiting the government from using the recordings or calling Agent Cessario as a witness.

---

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

Although his co-defendants proceeded to trial and were convicted, Paris conditionally pleaded guilty to one count of honest-services wire fraud. In the plea agreement, he reserved the right to appeal the district court's refusal to dismiss the indictment.

## II.

Paris's appeal focuses on each of the constitutional theories that he raised before. We review the decision denying dismissal of the indictment de novo and the underlying factual findings for clear error. *See United States v. Webster*, 625 F.3d 439, 446 (8th Cir. 2010); *United States v. Boswell*, 270 F.3d 1200, 1206 (8th Cir. 2001).

## A.

We begin with the alleged conflict of interest. Government agents interviewed Woods, who was at that point cooperating, more than a year before the indictment. During these interviews, Woods made incriminating statements about his co-conspirators, including Paris. Woods's attorney at the time had previously represented Agent Cessario, who was also present for the interviews, in an unrelated divorce proceeding that had ended about fourteen months earlier. Paris argues that the attorney's allegedly divided loyalties led to inadequate protection of Woods's interests. The government's failure to prevent the conflict, according to Paris, resulted in fundamentally unfair proceedings under the Fifth Amendment and violated Woods's Sixth Amendment right to conflict-free counsel.

This claim, even as Paris describes it, is derivative of Woods's right to counsel. To prevail, Paris must show that he has standing to seek a remedy for the alleged constitutional harm that Woods suffered. The law does not recognize standing in these circumstances. *See United States v. Fortna*, 796 F.2d 724, 732–33 (5th Cir. 1986) (holding that codefendants did not have standing to "assert a violation of [another defendant's] attorney-client relationship"); *United States v. Escobar*,

50 F.3d 1414, 1422 (8th Cir. 1995) (citing *Fortna* with approval). The Sixth Amendment right to counsel is personal to each defendant, *Texas v. Cobb*, 532 U.S. 162, 171 n.2 (2001), so even if there was a conflict, it was for Woods, not Paris, to raise. *See Fortna*, 796 F.2d at 732.

Attempting to repackage the claim as a violation of his own due-process rights does not get Paris past the finish line either. He tries to draw an analogy to an involuntary confession, which third parties may challenge if the government seeks to use it as evidence against *them*. *See United States v. House*, 825 F.3d 381, 388 (8th Cir. 2016) (citing *United States v. Dowell*, 430 F.3d 1100, 1107 (10th Cir. 2005)). But the reason, as we pointed out in *House*, is that the use of a false confession against others is itself a separate Fifth Amendment violation, so the third party is really raising his or her "own right to a fair trial." *Id.*

In this case, by contrast, Paris cannot show how the constitutional violation that Woods allegedly suffered specifically affected *his* right to a fair trial. Nor is there any evidence that Woods's statements to the government were anything other than voluntary and truthful. *See United States v. LeBrun*, 363 F.3d 715, 725–26 (8th Cir. 2004) (en banc) (stating that a confession is involuntary only if "the authorities overbore the defendant's will and critically impaired his capacity for self-determination"). In short, no matter how we view Paris's argument, it was not his to make.

B.

Paris also challenges the Neal recordings on Fifth and Sixth Amendment grounds, only now he raises his own rights. Before pleading guilty in a separate criminal case, Neal recorded his conversations with numerous individuals, including Woods. Some of the recordings, at least according to Paris, contained information about how the defense planned to counter the government's case.

Neal's recording device came from his lawyer, not from the government. As he made the recordings, he would periodically give them to a legal assistant in his lawyer's office, who would then store them before uploading them to Dropbox, an online-file-storage-and-sharing service. Although the government admits that it knew about Neal's plans ahead of time, Neal has been clear that he acted on his own and did not share the audio files with the government until after his recording days were over.

Government action is a necessary element for this type of Fifth or Sixth Amendment claim. *See United States v. Williams*, 720 F.3d 674, 686 (8th Cir. 2013) (stating that only "deliberate intrusion" into the attorney-client relationship by the government can establish a Fifth Amendment violation); *United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986) (requiring the "*government* [to have] knowingly intruded into the attorney-client relationship" for a Sixth Amendment violation (emphasis added)). In the Sixth Amendment context, for example, we have said that informants only become government agents if officials have "instructed" them to gather information on a "particular" person. *Stewart v. Wagner*, 836 F.3d 978, 986 (8th Cir. 2016) (quoting *Moore v. United States*, 178 F.3d 994, 999 (8th Cir. 1999)). Mere acquiescence is not enough.[2] *See id.*

Yet government acquiescence is all that we have here. To be sure, Neal admits that the purpose of the recordings was to assist prosecutors. But there is no evidence that government officials directed Neal to gather information on Paris. *See Stewart*, 836 F.3d at 986. Without this type of evidence, Neal's actions could not have violated Paris's constitutional rights.

---

[2]Paris relies on a different line of cases involving Fourth Amendment searches. *See United States v. Miller*, 152 F.3d 813, 815 (8th Cir. 1998); *United States v. Malbrough*, 922 F.2d 458, 461–62 (8th Cir. 1990). In those circumstances, agency can exist once the government knows about a plan to conduct a search and fails to do anything to stop it. *See Malbrough*, 922 F.2d at 462. Paris does not rely on the Fourth Amendment, so these cases have no bearing here.

C.

The recordings also play a role in the next issue: whether Agent Cessario's decision to erase his laptop's hard drive entitled Paris to dismissal. We agree with the district court that it did not.

1.

Additional recordings surfaced on the eve of trial. The legal assistant who handled them inadvertently missed some when she first uploaded them to Dropbox. She added them later, but the government apparently did not check the account again until shortly before trial. This discovery led to a flurry of activity, including the scheduling of an evidentiary hearing. In preparation for the hearing, prosecutors asked Agent Cessario to turn over his laptop for a forensic examination.

Agent Cessario must not have been too keen on the idea. After falsely telling prosecutors that the laptop's hard drive had been erased earlier, he paid a local computer shop to actually do it. Apparently unsure about whether a forensic examiner could still recover the data, he scrubbed the hard drive again—this time on his own—before finally delivering the laptop as requested. When Paris discovered what Agent Cessario had done, he added it to his list of reasons for seeking dismissal.

The district court considered Paris's request during the course of a three-day evidentiary hearing. Thirteen witnesses testified, including Agent Cessario, the legal assistant who handled the recordings, a Dropbox employee, and two forensic examiners. The government also introduced records that documented activity within the Dropbox account.

The records showed that Agent Cessario never added, deleted, or modified any files. In fact, a metadata analysis revealed that the recordings remained unchanged from the time of their creation until they were shared with Paris's

counsel. No one, in other words, was able to identify even a single *existing* piece of evidence that might have been impacted by Agent Cessario's actions.

So what was on the laptop then? Agent Cessario claimed at the hearing that he had deleted the data to protect his own private medical records. He had stored them there, he explained, in anticipation of eventually filing a medical-malpractice lawsuit. The district court found his explanation hard to believe. The idea that he would have gone to such lengths—risking his career, reputation, and even jail time— to keep medical records secret seemed farfetched. The court suspected that some other motive had to be at play, like trying to conceal something that he was not supposed to have. No one ever discovered, however, what he was trying to hide.

Still, the district court was able to make a number of factual findings. In a lengthy order, it found, among other things, that even though Agent Cessario acted in bad faith in deleting the data on the hard drive, it was "especially unlikely" that he had "destroyed any information that [was] material to the charges and defenses in the case." (Emphasis omitted). And on the small chance that he did, Paris and his co-defendants received all of the recordings, including those that were discovered on the eve of trial, so he suffered no "prejudice or substantial risk of prejudice" from the misconduct.

Nevertheless, the district court did not let Agent Cessario's actions go unremedied. It ordered the government not to call him as a witness or use the recordings, even though much of the evidence was likely "already in [Paris's] possession." And although Agent Cessario had acted "reprehensib[ly]," it declined to dismiss the indictment because doing so would not have been "proportional to the harm."

2.

The general rule is that "[l]aw enforcement's failure to preserve potentially exculpatory evidence violates due process if the defendant can show that [it] acted

in bad faith." *United States v. LeBeau*, 867 F.3d 960, 976–77 (8th Cir. 2017) (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)). "Additionally, the 'evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.* at 977 (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)); *see also Webster*, 625 F.3d at 446 (requiring the same two showings when the evidence is "potentially useful"). Although we do not question the district court's finding that Agent Cessario acted in bad faith, the no-comparable-evidence and apparent-exculpatory-value requirements pose problems for Paris.

For evidence that we *know* was once on the laptop, the record shows that Paris received it through "other . . . means." *Trombetta*, 467 U.S. at 489. There is little doubt that the laptop once contained copies of Neal's recordings. After all, prosecutors asked to have it forensically examined precisely because Agent Cessario used it to access Dropbox. But Paris received every one of these recordings from an independent source. And the evidence before the district court revealed that none of the recordings had been altered or deleted by Agent Cessario. So not only were the recordings "reasonably available" to Paris, they were *actually* available to him. *Id.*

As for other evidence that *could* have been on the laptop, Paris seems to suggest that it must have had exculpatory value or else Agent Cessario would not have gone to the trouble of erasing it. He then proceeds to imagine all types of evidence, including other recordings that might have fallen through the cracks.

There are at least three reasons to doubt this theory. First, there is no proof, even after an evidentiary hearing, that more recordings (or any other exculpatory evidence) exist. Second, even if there is exculpatory evidence out there, Paris has not rebutted the notion, first advanced by the district court, that it may never have been on the laptop and that Agent Cessario may have erased the data for an altogether different reason: to hide the fact that he possessed something that he should not have. Third, even if exculpatory evidence exists *and* it was once on the laptop, Paris cannot

pinpoint what it might be or how it might be "probative of his factual guilt or innocence." *LeBeau*, 867 F.3d at 977 (rejecting the argument that surveillance videos allegedly showing that police had "used a ruse" to enter and search the defendant's hotel room had "apparent exculpatory value"). His argument, in other words, consists of speculation built upon speculation.

Paris is right that it is difficult for him to show what he cannot know. After all, only Agent Cessario knows for sure what he destroyed and whether it had any connection to this case. But without even a viable theory about what is missing, much less how it might differ from what he already had in his possession, Paris has not established a violation of his due-process rights. Under these circumstances, the court did not err in declining to dismiss the indictment.

III.

We accordingly affirm the judgment of the district court.

———————————————