# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-3057

_____

United States of America

*Plaintiff - Appellee*

v.

Jonathan Woods

*Defendant - Appellant*

_____

No. 18-3058

_____

United States of America

*Plaintiff - Appellee*

v.

Randell G. Shelton

*Defendant - Appellant*

_____

National Association of Criminal Defense Lawyers

*Amicus on Behalf of Appellant(s)*

_____

Submitted: January 16, 2020
Filed: October 16, 2020
_____

Before KELLY, MELLOY, and KOBES, Circuit Judges.
_____

MELLOY, Circuit Judge.

A jury convicted defendants Jonathan Woods and Randell Shelton of several crimes involving bribes and kickbacks using public funds. Woods and Shelton appeal the district court's[1] denial of their motions to dismiss their indictments alleging due process violations based on government misconduct—an FBI agent's undisputedly wrongful destruction of data on a laptop computer. They also appeal the district court's grant of a government motion *in limine* excluding evidence of the agent's misconduct pursuant to Federal Rule of Evidence 403. Finally, they appeal as to several additional trial and pretrial issues. For the reasons set forth herein and in our opinion in a co-conspirator's companion case, United States v. Paris, 954 F.3d 1069 (8th Cir. 2020), we affirm.

## I. Background
### A. The Conspiracy, Generally

The underlying conspiracy at issue in this case was possible because of a provision of Arkansas law under which certain state revenues were set aside in a

_____

[1]The Honorable Timothy L. Brooks, United States District Judge for the Western District of Arkansas.

"General Improvement Fund" (GIF) and earmarked for distribution essentially at the direction of individual elected representatives. This relatively unchecked power led to abuses. Exercise of this power, however, created a substantial "paper trail" as to who sought funds, which elected officials advocated for the distribution of particular funds, who received funds, and how portions of those funds were utilized as payments to conspirators.

Woods was a state senator and Oren Paris III was the president of a small college in northwest Arkansas, Ecclesia College. Shelton was a friend of Woods. Micah Neal, a state representative, also participated in the conspiracy. Ultimately, Ecclesia College received over $600,000 between 2013 and early 2015 at Woods's and Neal's direction in exchange for kickbacks to Woods and Neal funneled through a consulting firm, Paradigm Solutions, created by Shelton. In addition, Paris caused Ecclesia College to hire a specific employee at Woods's request at the outset of the conspiracy.

Evidence of the conspiracy was overwhelming and included: email communications directing applications for funds; the applications themselves; records of public fund distributions; banking records tracing payments to and from Shelton's firm; the timing of the creation of Shelton's firm; Shelton's repeated withdrawals of cash from his firm's account; contemporaneous cash payments to other conspirators; and large cash purchases by Neal and Woods contemporaneous with Shelton's cash withdrawals. For example, banking records from September 2013 showed Ecclesia College paying Shelton $50,000 shortly after receiving $200,000 in public funds as per Woods's instruction. Banking records then showed Shelton depositing the money in his own account and quickly transferring $40,000 to Woods's account. On another occasion, during December 2014 and January 2015, Ecclesia College paid Shelton $65,000 after receiving $200,000 in public funds. Shelton deposited the check and withdrew $56,200 in cash over the course of the following four days. Woods then arranged a meeting between Shelton and Neal behind Neal's family's restaurant

where Shelton paid Neal $18,000 cash. Finally, the record is replete with examples of Woods and Neal making large cash purchases close in time to Shelton's cash withdrawals, including furniture purchases or large payments on outstanding retail loans to a jewelry store.

## B. Investigation, Discovery, and the Destruction of Data

Upon discovery of the scheme, Neal and Woods cooperated with investigators. Woods cooperated between November 2015 and March 2016, ceasing his cooperation long before indictment. Neal began cooperating in January 2016, and in March 2016, he began using a pen-style recording device to make secret recordings of conversations with several co-conspirators, including Woods. Although he did not make the recordings at the government's instruction, he made the government aware of the recordings. Neal's attorney had purchased the pen recorder, and Neal periodically took the pen recorder to his attorney's office where a paralegal downloaded its contents to her computer, cleared its memory, and returned it to Neal for further use.

Eventually, government attorneys told investigators to obtain the recordings. At Neal's attorney's instruction, the paralegal made the recordings available to the government. In early November 2016, she placed files containing the recordings from her computer on Dropbox, an online-file-and-storage-sharing service. She also provided notice of the Dropbox account to the government's lead investigator, FBI Agent Cessario. Agent Cessario accessed the Dropbox account in early November 2016. In late November 2016, however, the paralegal discovered she had failed to upload all of the digital recordings to Dropbox, and she added the files she initially had missed. According to the paralegal, she did not expressly notify Agent Cessario that she uploaded additional files, but she believed he would have received an automatic notice of her activity directly from Dropbox.

In early 2017, Neal pleaded guilty to one count of conspiring to commit honest services mail and wire fraud. In March 2017, the government indicted Woods, Paris, and Shelton. In April 2017, the government turned over copies of Neal's recordings to defense counsel. Trial was scheduled for May 2017, but Woods moved successfully to continue the trial until December 2017.

In fall 2017, as trial approached, defense attorneys received copies of text messages between Neal's attorney and Agent Cessario that seemingly referenced recordings the defense attorneys had not received. This fact gave rise to suspicions of discovery abuses and allegations the government was concealing recordings. Ultimately, as explained below, neither the defense attorneys nor the government had received the second batch of recordings the paralegal uploaded to Dropbox—the files she uploaded in late November 2016. In addition, by November 2017, Shelton and Paris had filed motions to dismiss their indictments for reasons unrelated to Neal's recordings, but the district court had not yet ruled on those motions. To sort through the various arguments being raised, and to address the burgeoning discovery dispute, the district court scheduled an evidentiary hearing and, again, continued the trial, this time until April 2018.

In preparation for the hearing, prosecutors instructed Agent Cessario to deliver his laptop computer for a forensics examination to determine what files he had received and when he received them. At this point, the present cases suddenly became much more complicated. Agent Cessario lied to his superiors, telling them he previously had erased the laptop's hard drive. Then, prior to delivering the laptop for examination, he paid professionals to erase the laptop's hard drive. He then erased it a second time himself. Finally, he delivered the laptop to the FBI without revealing his recent destruction of data. Later, when confronted, he admitted that he destroyed laptop data after being asked to deliver the laptop for examination.

-5-

After learning of Agent Cessario's actions, Woods, Paris, and Shelton filed additional motions to dismiss alleging Cessario's destruction of data amounted to government misconduct rising to the level of a Fifth Amendment due process violation. With these motions, the evidentiary hearing expanded to address not only the question of what files the government had obtained and when it obtained them, but also to address the question of what data Agent Cessario destroyed and how his actions might relate to the pending cases. The district court heard testimony from thirteen witnesses over the course of several days. Witnesses included Agent Cessario, Agent Cessario's supervisor, Neal, Neal's attorney, that attorney's paralegal, a Dropbox employee, and forensics examiners. The government introduced records of activity within the Dropbox account and a metadata analysis of the files from the Dropbox account.

The district court found that Agent Cessario accessed the Dropbox account shortly after the paralegal uploaded the initial batch of files (in early November 2016), but did not access the account again until November 2017 when it came to light that additional files existed that the government had not turned over in April 2017. Testimony from Neal, Neal's attorney, and the paralegal showed they had not shared recordings with Cessario prior to November 2016.[2] The district court ultimately determined that, like the defense attorneys, the government had not accessed the second batch of recordings until November 2017. Metadata analysis showed that the recordings had not been changed between the time they were created and the time they were shared with defense counsel—neither Agent Cessario nor

---

[2]Neal's attorney explained, however, that Neal would occasionally text him to describe who or what he was recording. Neal's attorney characterized these text messages as "random information." Neal's attorney stated that on several occasions, he forwarded the texts he received from Neal on to Agent Cessario. In addition, Neal testified that he believed his attorney was forwarding the texts to Agent Cessario. These texts were produced to the defense and appear to have been the texts that aroused suspicions as to the possibility of missing recordings.

anyone else added, deleted, or modified the Dropbox files. Because defense counsel ultimately received the files uploaded to Dropbox, the district court determined defendants had obtained the files that Neal provided to his attorney's office and that were made available to the government.

The district court then addressed the question of Agent Cessario's misconduct. The court expressly found that Agent Cessario had not only lied to his superiors, but lied to the court during his testimony. Agent Cessario testified that he had not lied to his superiors when he initially claimed to have erased his hard drive at an earlier date because he simply misunderstood the difference between erasing a hard drive and taking lesser actions with a computer such as clearing the cache of an internet browser. The district court found this testimony non-credible given Agent Cessario's later actions of paying to wipe the hard drive and then personally wiping the hard drive. Agent Cessario also claimed he wiped the hard drive after being asked to turn over his laptop because he wanted to conceal embarrassing medical evidence he had stored on the computer in anticipation of a possible medical malpractice suit. The district court reviewed the medical records and concluded nothing contained in the records was sufficiently sensitive to credibly explain why Agent Cessario would have placed his career in jeopardy and exposed himself to possible prosecution by destroying data and lying to the FBI and the court. In rejecting Agent Cessario's story as to medical records, the district court speculated as to what was destroyed, and stated: "Far more likely, in this Court's mind, is that it was something that posed an even *greater* risk to his job, public reputation, and liberty than was posed by his decision to wipe the laptop."

The court then addressed suggestions and arguments as to what might have been on the laptop and how it might relate to the case. The court first noted that there was nothing to suggest destroyed data might have been case related. The court explained that the personal risk to Agent Cessario in the act of destruction far outweighed any agent's or prosecutor's interest in the prosecution of a particular case.

The court also noted that defense counsel already had received the Neal recordings from Dropbox. The court acknowledged the "theoretical possibility" that something else case related might have been destroyed. The court was unable, however, "to come up with any plausible scenarios" that might explain how defendants could be prejudiced. The court emphasized that "[s]urely [Agent Cessario] was not falsifying the financial and legislative records on which the Government will rely at trial, given that the parties will simply subpoena the undoctored originals from the institutions that maintain them." The court rejected defense suggestions that the laptop might have contained additional Neal recordings because the existence of any such recordings and their presence on Cessario's laptop would necessarily presume Neal had gone behind his own attorney's back, not merely behind the government's back, to create such recordings, get them to Agent Cessario, and conceal them from his attorney. Finally, the court emphasized that (1) it previously had ruled that creation of recordings was legal in that Neal acted of his own accord, and (2) the recordings that the defendants actually received included statements from Woods denying wrongdoing. As such, the court rejected the speculation that additional recordings existed that defendants did not otherwise receive and that might have been exculpatory.

Ultimately, the district court found a Fifth Amendment Due Process violation based on Agent Cessario's bad faith destruction of "potentially useful evidence" in that the laptop contained "information . . . about the Dropbox account" that the parties had sought in reference to the discovery dispute. However, the court concluded "there is no evidence in the record to show and no good reason to believe, that [Agent Cessario] destroyed any information that is material to the charges and defenses in this case but not already in the Defendants' possession." As such, the court found dismissal of the indictment unwarranted and not proportional to the harm, in that the defendants were able to obtain by other means a record of Dropbox files and activities. As a lesser sanction, the court precluded the government from introducing

-8-

in its case-in-chief any testimony from Agent Cessario or recordings made by Neal. The district court did not preclude the defense from using such materials.

## C. Motion in Limine and Motion to Continue

In a separate ruling, the district court granted a government motion *in limine* to exclude evidence of Agent Cessario's destruction of data as evidence whose "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues . . . [or] wasting time." Fed. R. Evid. 403. The government argued in its briefing to the district court that Agent Cessario's act of wiping his laptop in December 2017 had no relevance to the charged crimes in the case concerning a conspiracy to misuse public funds between 2013 and 2015. The government argued that even if Agent Cessario's misconduct were somehow relevant to the pending criminal charges, evidence of his misconduct was substantially outweighed by the risk of wasted time and prejudice arising from a "mini-trial regarding [Agent] Cessario's misconduct," "[t]he likely effect" of which "would be to divert the jury's attention from the evidence regarding the bribery/kickback scheme and to focus it on the unrelated misconduct of [Agent] Cessaro," creating "the very real possibility that the jury would improperly and unfairly discredit the Government's evidence at trial because of its dislike and disapproval of [Agent] Cessario's misconduct." The defendants countered that examination of Agent Cessario's actions by the jury remained necessary to explore *Neal's* credibility, effectively cross-examine Neal, and show that the entire investigation and any cooperators were potentially tainted by the actions of a corrupt lead investigator.

In granting the motion, the district court distinguished the issue of Neal's credibility from the issue of Agent Cessario's bad acts. The district court emphasized that the government was not seeking to preclude cross examination of Neal or exploration of Neal's motives for testifying. The district court noted that defendants were free to ask Neal about: recordings he had made; his interactions with Agent

Cessario; who he gave his recordings to and when; and his motives for testifying. In fact, the district court did not completely close the door on the possibility of allowing the jury to hear about Agent Cessario's bad acts. Specifically, the district court stated: "[P]erhaps Mr. Neal's responses to those questions will lay some presently unforeseeable foundation to connect his testimony with Agent Cessario's decision to wipe the laptop. But on the record presently before the Court, the two simply do not appear to have anything to do with each other." Turning to the Rule 403 standard, the district court described the danger of unfair prejudice as "obvious and extreme," given the possibility that jurors might direct their judgment towards punishing Agent Cessario rather than weighing the evidence of the defendants' guilt or innocence. Finally, the court referenced the length of the evidentiary hearing that had already occurred as to Agent Cessario and the potential for a similar "mini-trial" to confuse issues and waste time.

Then, five days prior to trial, Paris pleaded guilty. Woods moved for another continuance, asserting that Paris's last minute plea disrupted trial planning and preparation. In particular, Woods told the district court that he had planned a team defense and was relying on Paris's counsel to present certain witnesses. According to Woods, Paris had denied, until pleading guilty, that he was involved in any conspiracy. The district court denied the motion, emphasizing the lengthy delays that had already occurred and noting the general foreseeability of a co-defendant's decision to plead guilty. Acknowledging Woods's concerns about witnesses and evidence, however, the district court allowed Woods to use Paris's witnesses and exhibits and ordered Paris's counsel not to release any witnesses from subpoena. Finally, the district court invited Woods to renew his motion if he could articulate with greater specificity why a continuance was needed. Other than making a *pro forma* renewal of all prior motions at the beginning of trial, Woods did not renew his request for a continuance or present the district court with additional information or arguments.

-10-

### D. Trial: Jury Instructions, Questions, and Responses

Trial lasted nineteen days. As referenced at the outset of this opinion, evidence was overwhelming, and testimony buttressed and explained extensive financial records, public records, and electronic communications. Neal testified as to his role in the scheme. Paris asserted his Fifth Amendment rights and did not testify. Shelton asserted he served as a fund-raiser for Ecclesia College and received legitimate payments for his work. He also asserted his payments to Woods were loans between friends rather than kickbacks and bribes. Regarding Neal's recordings and Agent Cessario, Defendants identify nothing from trial to suggest they laid a foundation as to Neal's interactions with Agent Cessario that might have opened the door to revisiting the district court's exclusion of evidence concerning Agent Cessario's misconduct.

After submission of the case to the jury, the jury sent several notes to the court, some of which were merely administrative. One note, however was substantive in that it involved a jury instruction. Woods argues this note resulted in a prejudicial and impermissible *ex parte* communication from the court to the jury. Shelton goes further, arguing this same interaction served to constructively amend the indictment (or permit conviction on evidence that varied from the indictment).

The jury instruction in question, Jury Instruction 7, set forth the elements of Honest Services Wire Fraud.[3] The first element of the offense, as set forth in the

---

[3]In material part, this instruction stated:

It is a crime to use bribery or kickbacks in a fraud scheme that deprives the public of its right to the honest services of a public official. Counts 2, 3, and 5 through 15 of the Second Superseding Indictment charge Mr. Woods and Mr. Shelton with committing such a crime in the form of Honest Services Wire Fraud. This crime has four elements, which are:

instruction, required the jury to find the defendant "voluntarily and intentionally devised or participated in a scheme to defraud the public." The instruction then described the scheme as discussed throughout this opinion: Woods and Neal using their positions to direct GIF monies to Ecclesia College in exchange for kickbacks through Shelton. The "Definitions and Explanations" section of that same instruction defined "scheme to defraud" as: "any plan or course of action intended to deceive or cheat another out of the right to honest services where a bribe or kickback is solicited, paid, or received in exchange for official action or an official act."

---

One, the defendant voluntarily and intentionally devised or participated in a scheme to defraud the public of its right to the honest services of a public official through bribery, which scheme to defraud is described as follows:

Mr. Woods, and later Micah Neal, agreed to use their official positions as Arkansas legislators to direct GIF monies to Ecclesia College in exchange for bribes paid by Oren Paris III through Ecclesia College, consisting of employment for Mr. Woods's friend Elizabeth Newlun and/or payments to Mr. Woods and Mr. Neal through Mr. Shelton's company Paradigm Strategic Consulting LLC;

Two, the defendant did so with the intent to defraud;

Three, the scheme to defraud involved a material false representation or concealment of fact; and

Four, the defendant used, or caused to be used, an interstate wire facility in furtherance of, or in an attempt to carry out, some essential step in the scheme.

-12-

During deliberations, the jury sent the district court a note specifically asking a question about Element One of Jury Instruction 7. The jury asked:

When considering possible illegal activity:

1. Do monies have to flow to Ecclesia College and
2. Do payments have to be made to
3. Mr. Woods and
4. Mr. Neal

Is the paragraph in Element One a general description or specific criteria that needs to be met?

In response to this question, the district court convened counsel for a hearing. The court presented counsel with a proposed response, to which the government acquiesced and to which Woods and Shelton objected. The proposed response stated in material part that the jury did not have to find that money flowed to Ecclesia College, Neal, or Woods and that the instruction's detailed description of the scheme was not itself a part of the elements that had to be proven. The response provided, instead, that the narrative section of the instruction was merely a "general description" of the scheme at issue.[4]

_____

[4]The proposed response as discussed in court with defense counsel stated (with our emphasis added):

The paragraph of Element One that describes the alleged scheme to defraud is a *general description* of the alleged scheme. In order for you to find that the Government has proved Element One beyond a reasonable doubt with respect to the particular Defendant and Count you are considering, it is not necessary for you to find that payments were actually made to any particular person or entity, and it is not necessary for you to find that monies actually flowed to Ecclesia College. With respect to Element One, you are simply being asked to determine whether the Government has proved beyond a reasonable doubt that the

-13-

Woods and Shelton argued the jury needed to find the exchange of money with Ecclesia College as an element of the offense. The district court concluded the hearing by telling the attorneys it would arrive at final language and simultaneously submit the language to the jury and notify counsel of the final language. Neither party objected to this proposed procedure. The court then sent an answer to the jury and copied the attorneys via email, using the language as presented to counsel at the hearing (as set forth supra note 4) in all respects other than the substitution of the word "summary" for the phrase "general description" and the word "summarized" for the phrase "generally described."

The jury returned its guilty verdicts two hours later. It found Woods guilty of: one count of conspiring to commit honest services mail and wire fraud; twelve counts of aiding and abetting honest services wire fraud; one count of aiding and abetting honest services mail fraud; and one count of money laundering. The jury found Shelton guilty of: one count of conspiring to commit honest services mail and wire fraud; ten counts of aiding and abetting honest services wire fraud; and one count of aiding and abetting honest services mail fraud.

Finally, Woods had moved for the district court judge to recuse himself from the case in a pre-trial motion filed in January 2018. The district court denied the

particular Defendant you are considering "voluntarily and intentionally devised or participated in a scheme to defraud the public of its right to the honest services of a public official," which scheme is *generally described* in the paragraph you referenced. When determining whether Element One has been proved beyond a reasonable doubt, bear in mind the definition of the phrase "scheme to defraud" that appears in the first paragraph of the "Definitions and Explanations" section of Final Instruction No. 7, as well as the definition of "official action" or "official act" that appears in Final Instruction No. 13.

motion in March 2018, prior to trial. We discuss additional facts concerning the recusal issue in our analysis below.

## II. Discussion

Shelton and Woods appeal the district court's orders relating to Agent Cessario including the denial of their motion to dismiss and the exclusion of evidence under Rule 403. Woods challenges the denial of his motion for a continuance following Paris's plea. Both defendants challenge the district court's handling of the jury question as to Instruction 7. Finally, Woods challenges the district court's denial of his recusal motion.

## A. Motion to Dismiss

"We review the decision denying dismissal of the indictment de novo and the underlying factual findings for clear error." Paris, 954 F.3d at 1071. We review the district court's fashioning of a remedy short of dismissal, such as the partial exclusion of evidence or witnesses, for abuse of discretion, giving due deference to the district court's role in managing trials and discovery in criminal prosecutions. Cf. United States v. Davis, 244 F.3d 666, 670 (8th Cir. 2001) (identifying government bad faith and the degree of prejudice as factors to consider in determining a remedy for government discovery abuse).

In Paris's separate appeal, we addressed the district court's denial of the motion to dismiss the indictment based on Agent Cessario's misconduct. See Paris, 954 F.3d at 1073–75. To the extent Woods and Shelton present the same arguments, we reject their arguments for the reasons stated in Paris. As described in Paris, our circuit precedent may, as a "general rule," require dismissal of an indictment on due process grounds if, prior to bad faith destruction of evidence, that evidence has apparent exculpatory value and that evidence cannot be obtained by other means. See id. at

1074 (applying <u>United States v. LeBeau</u>, 867 F.3d 960, 976–77 (8th Cir. 2017)). We also noted that our circuit has applied these same requirements where destroyed evidence was "potentially useful." <u>Id.</u> (describing <u>United States v. Webster</u>, 625 F.3d 439, 446 (8th Cir. 2010)). Applying this general rule, we agreed with the district court that Agent Cessario's reprehensible conduct satisfied the bad faith requirement. But we rejected Paris's arguments on both remaining grounds—lack of apparent exculpatory value and availability of the evidence by other means. We concluded: (1) there was nothing to suggest Agent Cessario destroyed anything material to Paris's guilt or innocence; (2) strong evidence adduced at an extensive hearing demonstrated the defendants had access to the Neal recordings and there was no reason to suspect Agent Cessario had access to additional recordings not in the defendants' possession; (3) the case against Paris was built primarily on financial and other records held by others and not subject to meaningful impeachment by the agent's wiping of a laptop he had used to access information the defendants already possessed; (4) the entire issue of the recordings, Agent Cessario's access to the recordings, and his destruction of computer data was an issue tangential to the case; and (5) there was nothing to suggest the motivation for Agent Cessario's act of destruction was related to the case at hand or a desire to gain a tactical advantage over the defendants rather than for reasons personal to Agent Cessario. <u>Id.</u> at 1074–75. These same considerations largely dictate the outcome in the present appeal.

To a limited extent, Woods and Shelton present slightly different arguments than Paris. At the end of the day, however, any differences in their arguments can best be characterized as slight variations in their challenges to the district court's underlying factual findings regarding the lack of apparent exculpatory value or the availability of evidence by other means.

For example, Woods and Shelton place particular emphasis on evidence from the evidentiary hearing tending to show a suspicious pattern of computer crashes, lost pen recorders, possible meetings between Agent Cessario and Neal that were not

memorialized with official debriefing reports, and conflicting testimony as to how many recordings might have been made. Based on this evidence, they assert the district court committed error in its determination that the defendants, via Dropbox, received all of the recordings Neal had made available to Agent Cessario. This same evidence, however, was presented to the district court, and the district court weighed this evidence alongside the testimony from Neal, Neal's attorney, the paralegal, the Dropbox employees, and forensic experts in reaching the conclusion that Agent Cessario had not destroyed recordings other than what the defendants actually received. Looking at all of the evidence, we find no clear error. United States v. Boswell, 270 F.3d 1200, 1206 (8th Cir. 2001) ("We defer to the district court's factual findings with regard to the destruction of evidence.").

By way of further example, Shelton in particular argues Neal's testimony was the lynchpin of the government's case. According to Shelton, without testimony from Neal, the government would have been unable to show that Shelton paid Neal or that payments Shelton made to Woods were, in fact, kickbacks or bribes. Shelton had characterized the payments to Woods as personal loans between friends unrelated to the alleged scheme and unrelated to the contemporaneous receipt of public funds. Shelton, therefore, characterizes evidence concerning Neal and Agent Cessario as having apparent exculpatory value in that Shelton believes it would have aided him in impugning Neal's credibility.

We reject this argument, again, as failing to demonstrate clear error in the district court's factual assessment. As an initial matter, Shelton's emphasis on the importance of Neal's trial testimony appears somewhat misplaced given the jury's ability to invoke common sense in reaching conclusions. See S.M. v. Lincoln Cnty., 874 F.3d 581, 588 (8th Cir. 2017) (finding evidence sufficient to support verdict where the evidence "gave the jury a common-sense basis for resolving an issue"). It is somewhat doubtful that the jury required Neal's testimony as a roadmap to reach its conclusions. Regardless, even assuming Neal's testimony—and therefore his

credibility—were critically important, the district court reasonably and expressly determined that Neal had not made additional recordings behind his attorney's back for secret delivery to Agent Cessario. The district court also permissibly determined, in the context of the case as a whole, that Agent Cessario's unknown motivations for destroying unknown computer data did not materially impugn Neal's credibility. Given the nature of the allegations in these cases, and the public and financial records on which the prosecution built its case, we find no clear error in the district court's assessment.

Without more substantial independent arguments to distinguish their cases from their co-conspirator's case, Woods's and Shelton's arguments largely reduce to the challenges we rejected in Paris.

Woods and Shelton also argue that, even if the district court did not err in denying their motions to dismiss, the remedy imposed was inadequate and, if anything, favored the government. To recap, the district court precluded the government from calling Agent Cessario or introducing any Neal recordings as part of its case in chief. The district court did not preclude the defense from calling Agent Cessario or introducing Neal's recordings. According to Woods and Shelton, the government had no intention of using the recordings or calling Agent Cessario such that the remedy imposed was no remedy at all.

Woods and Shelton's argument concerning the particular remedy imposed is a little confusing. At the end of the day, they do not clearly identify what other remedy the district court should have imposed, other than a complete dismissal of their indictments, and they do not claim to have suggested a lesser sanction to the court below. In choosing a remedy, the district court cited a case from a different context for the general proposition that the remedy imposed for a rights violation must be commensurate in scope with the violation and must recognize not only the defendant's rights, but also the public's interest in pursuing convictions. See United

States v. Blue, 384 U.S. 251, 255 (1966) (holding in the context of a presumed violation of the right against self-incrimination that the proper remedy would be the exclusion of evidence rather than the barring of prosecution because "numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether," and that "[s]o drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book").

Here, we accept the district court's finding that the evidence destroyed was "potentially useful" in that it related to a discovery dispute. As we repeatedly emphasized in Paris, and as the district court found below, however, there is simply nothing to connect the dots between Agent Cessario's destruction of his computer data and the underlying cases against Woods, Shelton, Paris, and Neal, as proven largely through records held by third-party custodians unrelated to and unaffected by Agent Cessario. Given the tangential nature of the entire Agent Cessario debacle in these prosecutions and given the independent nature of the actual evidence of the underlying offenses, we find no abuse of discretion in the district court's chosen remedy.

B. Exclusion of Evidence Pursuant to Federal Rule of Evidence 403

"We review a trial court's evidentiary rulings under an abuse of discretion standard, giving substantial deference to a trial court's exclusion of evidence under Federal Rule of Evidence 403 so long as the trial court's exercise of discretion '[does] not unfairly prevent a party from proving [its] case.'" Wheeling Pittsburg Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 716 (8th Cir. 2001) (alterations in original) (quoting White v. Honeywell, 141 F.3d 1270, 1274 (8th Cir. 1998)). Exclusion of particular evidence is proper "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues . . . [or] wasting

time." Fed. R. Evid. 403. "This court gives great deference to the district court's weighing of the probative value of evidence against its prejudicial effect." United States v. Tyerman, 701 F.3d 552, 563 (8th Cir. 2012).

In granting the government's motion to exclude evidence of Cessario's bad acts, the district court made clear that it was not limiting the defendants' ability to question Neal as to his recordings, his motivations to testify, or his interactions with Agent Cessario. And, as stated above, the district court did not completely close the door on introduction of Agent Cessario's bad acts assuming the defense could lay a sufficient foundation for such evidence through Neal's testimony. The defendants did not do so. We find this meaningful in terms of whether the district court abused its discretion among the range of choices available to it when crafting a ruling on the government's motion.

For all the reasons stated above, primarily due to the tangential nature of Agent Cessario's acts when viewed against the evidence in the case, we find no abuse of discretion. We find no error in the district court's assessment of potential prejudice, confusion of issues, wasting of time, or in the balancing of these issues. The district court fully explained the risk of prejudice, labeling as "obvious" the risk that the jury would seek to punish Agent Cessario rather than fairly judge the evidence presented at trial. Given the length of the evidentiary hearing that preceded trial, the length and complexity of trial, and the possible confusion arising from potential expansion of the trial into issues concerning Agent Cessario, the district court permissibly found exclusion appropriate. To the extent the defendants continue to assert that Agent Cessario's bad acts reflect upon Neal's credibility, we emphasize that Rule 403 demands not merely a relevancy test—it demands a balancing test and expressly envisions that relevant evidence may be excluded. Even assuming Agent Cessario's tangential bad acts may be deemed relevant to Neal's credibility, the district court permissibly discounted this fact in the overall "weighing of the probative value of evidence against its prejudicial effect." Id.

-20-

## C. Denial of Motion for a Continuance

We review the denial of the motion for a continuance for a prejudicial abuse of discretion. See United States v. Thurman, 368 F.3d 848, 851 (8th Cir. 2004). Woods received a continuance of over seven months. The district court then continued the case an additional four months due to the discovery dispute and Agent Cessario issues. When Paris ultimately pleaded guilty, Woods offered the district court little in the way of specific facts to explain why a codefendant's plea on the eve of trial required another continuance. And, as noted above, the district court kept Paris's witnesses under subpoena, allowed Woods to use Paris's exhibits and witnesses, and invited Woods to renew his motion if and when he could offer more specific support.

Even assuming Woods did not waive this issue by failing to reassert his motion with additional support, as invited by the district court, we conclude the district court did not abuse its substantial discretion. First, a co-defendant's last-minute decision to plead guilty generally is foreseeable. Second, the underlying facts in this case primarily came from 2013 through early 2015. When Woods sought an additional delay in April 2018, he had already received a substantial continuance followed by the additional delay brought on by the discovery dispute and the need to investigate Agent Cessario's actions. Notwithstanding ample time to prepare for trial, and ample time to provide facts and details as to how denial of the continuance might have prejudiced his defense, Woods fails on appeal to identify with any specificity how he was harmed by the lack of a further continuance. Finally, we note that although Paris pleaded guilty, (1) he asserted his right not to testify, and (2) the government's witness and exhibit list remained unchanged. "[A] 'district court's discretion is at its zenith when the issue [of a continuance] is raised close to the trial date.'" United States v. Chahia, 544 F.3d 890, 896 (8th Cir. 2008) (second alteration in original) (quoting United States v.

-21-

Whitehead, 487 F.3d 1068, 1071 (8th Cir. 2007)). Here, we find no abuse of this substantial discretion.

## D.  Jury Question Responses

We understand the arguments as to jury instructions to encompass three inter-related issues.  We address them in turn.

First, to the extent Woods and Shelton argue Instruction 7 as originally given, or as amended, misstated the law, we reject their argument.  The offense of honest services wire fraud does not require proof of payment or otherwise require proof of consummation of the scheme.  See, e.g., United States v. Jain, 93 F.3d 436, 441 (8th Cir. 1996) ("Essential to a scheme to defraud is fraudulent intent. . . . The scheme to defraud need not have been successful or complete.  Therefore, the victims of the scheme need not have been injured.  However, the government must show that some actual harm or injury was contemplated by the schemer." (alteration in original) (emphasis omitted)).  Underlying all arguments as to Instruction 7, then, is the simple fact that it was a proper instruction.

Second, to the extent Woods and Shelton argue the district court violated their Sixth Amendment rights by engaging in *ex parte* communication with the jury, we reject their argument due to a lack of prejudice.  "[C]ommunications between the judge and jury, absent counsel, violate the Sixth Amendment and are presumptively prejudicial, but that presumption can be overcome by a lack of prejudice."  Shelton v. Purkett, 563 F.3d 404, 408 (8th Cir. 2009); Stewart v. Nix, 972 F.2d 967, 971 (8th Cir. 1992) ("Such presumption may be overcome, however, by a clear indication of lack of prejudice.").  At the end of the day, the only *ex parte* component of the court's communication with the jury concerning Instruction 7 was the final delivery of the amended instruction to the jury.  The amended instruction was identical to the proposed amended instruction as discussed with counsel during the hearing other than

the substitution of the words "summary" and "summarized" for the phrases "general description" and "generally described," respectively. In all other respects, the "trial court . . . provide[d] the defense attorney with notice and a meaningful opportunity to object before responding to [the] question asked by the jury." Stewart, 972 F.2d at 971. At the hearing the district court informed the parties that it intended to finalize language and deliver the instruction to the jury with simultaneous emails to counsel. Neither party objected to the proposed procedure as described in advance by the court. The government characterizes the final, *ex parte* changes to the instruction as *de minimis* and lacking any substance capable of prejudicing the defendants. Woods and Shelton, in contrast, argue the jury's quick return of a verdict after receiving the instruction proves prejudice. We agree with the government in this instance. We are unable to imagine how the *de minimis* substitution of phrases altered the instruction in any material respect, much less prejudicially altered the instruction.

Third, and finally, Shelton argues that, because evidence at trial included at least one and possibly two other schemes, the failure to require the jury to make a finding specifically as to the transfer of GIF funds created the possibility that Shelton was convicted of participating in a scheme different from the GIF scheme at issue in his indictment. Shelton characterizes this alleged error as a constructive amendment of the indictment or, alternatively, as a conviction upon facts that varied from those alleged in the indictment. See United States v. Stuckey, 220 F.3d 976, 981 (8th Cir. 2000) ("The basic difference between a constructive amendment and a variance is this: a constructive amendment changes the charge, while the evidence remains the same; a variance changes the evidence, while the charge remains the same."). While the remedies and consequences for constructive amendments or variances may differ, we review de novo the underlying question of whether either one occurred below. Id. ("Whether a variance exists, and, if so, whether that variance prejudiced [Shelton], are questions of law that we review de novo."); United States v. Hill, 835 F.3d 796, 799 (8th Cir. 2016) (standard of review as to constructive amendment).

-23-

Based on the details of what Shelton alleges concerning other potential schemes, we reject his arguments. First, he identifies a scheme as alleged in a separate count against Woods but not against Shelton in which Woods directed GIF funds to an organization named Ameriworks in exchange for kickbacks from a man named Cranford. Shelton was not alleged to have been involved in that scheme, which was separately charged and was addressed in a separate jury instruction. Further, the district court expressly and repeatedly informed the jury that evidence of that separate scheme was to be considered only as to Woods. Finally, although Instruction 7 as to Shelton did not require the jury to find consummation of the scheme involving Paris and Ecclesia College, the instruction unambiguously identified the scheme involving Paris and Ecclesia College as the scheme at issue in the charges against Shelton. Instruction 7, as amended, therefore, reinforced for the jury that the charges against Shelton focused on the Ecclesia College GIF scheme. We find no constructive amendment and no potential for conviction based on a variance as to unrelated facts addressing the separately charged scheme involving Woods and Cranford.

Second, Shelton points to evidence involving medical marijuana legislation that Woods and Paris discussed, and which Woods proposed. The legislative efforts at issue, had they been pursued, would have led to a multi-year process resulting in a voter referendum to amend the Arkansas Constitution. The connection between Woods and Paris as to this legislation addressed the possible generation of tax receipts for distribution to institutions such as Ecclesia College. Over objection, the district court allowed this evidence of uncharged acts or transactions because it tended to show Woods working to promote Ecclesia College. See United States v. Maxwell, 643 F.3d 1096, 1100–01 (8th Cir. 2011) (noting government's broad leeway in admitting evidence tending to prove the other conspirators were "working in concert").

-24-

Shelton's argument as to this evidence is less than clear. Even assuming this evidence somehow could be construed as a distinct scheme rather than merely evidence of cooperation among co-conspirators, the government did not urge conviction of Shelton based upon any such scheme. Rather, as just noted, amended Instruction 7—the focus of Shelton's argument—specifically identified the GIF scheme and did not reference any connection to medical marijuana. At the end of the day, Shelton presents a confusing, composite argument that seemingly pulls together arguments about: (1) *ex parte* communications, (2) an earlier refusal to sever the trial to isolate the Woods-only count, (3) the failure to exclude evidence of the arguably separate medical marijuana "scheme," and (4) the failure to demand the jury find money flowing to Ecclesia College as an element. None of these issues involved error independently, and they do not involve error in combination. The instruction and the response to the jury question were correct statements of law that very specifically and clearly referenced the one scheme identified in the charges against Shelton. The instructions and response did not broaden the indictment or empower the jury to convict Shelton of a scheme other than the GIF scheme alleged in the indictment. See United States v. Parker, 871 F.3d 590, 606 (8th Cir. 2017) ("A constructive amendment of an indictment occurs when jury instructions broaden the scope of an indictment by permitting a conviction for an uncharged offense." (quoting United States v. Spencer, 592 F.3d 866, 873 (8th Cir. 2010))).

## E. Recusal

We review the denial of a motion for recusal for abuse of discretion. In re Steward, 828 F.3d 672, 681 (8th Cir. 2016). "Any . . . judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "[W]hat matters is not the reality of bias or prejudice but its appearance." Liteky v. United States, 510 U.S. 540, 548 (1994). But, we presume a judge to be impartial, and a party moving for recusal bears the "substantial burden of proving otherwise." United States v. Minard, 856 F.3d 555,

557 (8th Cir. 2017) (quoting United States v. Ali, 799 F.3d 1008, 1017 (8th Cir. 2015)). And, "[o]pinions based on facts or events occurring in a judicial proceeding 'do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" Minard, 856 F.3d at 557 (quoting Liteky, 510 U.S. at 555).

A few additional facts are necessary for discussion of this issue. Woods moved for recusal in January 2018 alleging an appearance of bias based on several comments the district court directed towards Woods's attorney, several adverse rulings, and revelation of the fact that the district court had viewed Woods's counsel's website. Woods raised additional arguments in his motion but does not renew them on appeal. On appeal, however, Woods expands his arguments, describing as improper the fact that the district court conducted independent legal research into other cases in which Woods's counsel had been sanctioned. Woods also identifies instances from trial he characterizes as further demonstrating bias. In particular, he alleges the district court improperly made an objection for the government during defense counsel's questioning of a witness. In addition, he renews his challenges to the Agent Cessario-related rulings and identifies those rulings as evincing bias.

As an initial matter, we note that Woods's arguments as to this issue focus largely upon the district court's comments as directed towards Woods's counsel. Undeniably, but in our view understandably, counsel had gotten under the district court's skin to a limited degree through repeatedly interrupting the district court, using salty language, and pushing—often aggressively—for rulings the district court perceived as being aimed more at delay than at productive litigation of the case. In ruling on the motion to dismiss, the district court issued a lengthy order, identifying and discussing Woods's various arguments, explaining the context for comments Woods had identified, and explaining rulings that Woods alleged to be unfair. The district court's explanation of the several comments are consistent with the record. In our view, the comments at issue, taken in context, do not remotely approach the

level needed to suggest impartiality. See Litkey, 510 U.S. at 555 ("[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."). The district court's various facially unbiased rulings largely speak for themselves, but the district court also discussed several other rulings that, on balance, demonstrated even-handed and often generous treatment of Woods.

Woods appears to place particular emphasis on the fact that the district court admitted (1) conducting research and identifying a prior case in which Woods's counsel was sanctioned and (2) viewing Woods's counsel's website. The former, while technically information not arising in the context of the present case, can hardly be characterized as information from an extrajudicial source. Judges are free to—are expected to—conduct legal research as they believe to be necessary in carrying out their duties. And the latter is in no manner objectionable. Judges, as human beings are necessarily interested in knowing who is practicing in their courtrooms. It is no more objectionable for a judge to view a firm's website than for a county seat lawyer to be personally acquainted with a presiding judge. "We have emphasized that '[r]ules against bias and partiality can never mean to require the total absence of preconception, predispositions and other mental habits.'" Ali, 799 F.3d at 1017 (alteration in original) (quoting United States v. Burnette, 518 F.3d 942, 945 (8th Cir. 2008)). Similarly we will not find bias in the natural and human curiosity that would lead a judge to look at publicly available information as to an attorney's experience or manner of holding himself out to the public.

The final point meriting comment is Woods's assertion that the district court improperly imposed an objection on the government's behalf. Woods's argument in this regard begins with the incorrect assumption that any such objection by the court

itself must be improper. That is not the law, in general, nor would we be inclined to view one such objection as evincing bias during a nineteen-day trial even if such an objection were inherently improper. See Fed. R. Evid. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."); Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1329–30 (8th Cir. 1985) (judicial intervention for clarification not improper). Here, the objection at issue was in response to defense counsel's introduction of facts not in the record through the means of a question, and was not an improper objection. Further, if in the hustle and flow of a lengthy trial, a judge momentarily speaks up in the face of an obviously improper statement by counsel, this slight deviation from the role of passive observer is neither improper nor evidence of bias.

In any event, the record in the present case belies Woods's assertion. The official trial transcript shows that, at the point in question, the government rather than the court raised the initial objection.[5] We find no abuse of discretion in the district court's denial of the motion for recusal or actions at trial evincing a need for recusal or disqualification.

We affirm the judgments of the district court.

_____

_____

[5]Woods unsuccessfully moved our court for a stay and remand to "settle the record" seeking a hearing and review of trial recordings for comparison to the official transcript. According to Woods, such review would have revealed the true story of what occurred at trial and shown that the district court did, in fact, object prior to the government. A panel of our court denied the motion. Woods now characterizes our Court and the district court's reporter as "prevent[ing]" him from proving the true state of the record.